# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| 77 CHARTERS, INC., individually and derivatively on behalf of Stonemar Cookeville Partners, LLC, and Cookeville Retail Holdings, LLC, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **C.A. No. 2019-0127-JRS** |
| JONATHAN D. GOULD, STONEMAR MM COOKEVILLE, LLC, COOKEVILLE CORRIDOR, LLC, EIGHTFOLD COOKEVILLE INVESTOR, LLC, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| STONEMAR COOKEVILLE PARTNERS, LLC and COOKEVILLE RETAIL HOLDINGS, LLC, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: February 4, 2020
Date Decided: May 18, 2020

John L. Williams, Esquire and Brian C. Crawford, Esquire of The Williams Law Firm, P.A., Wilmington, Delaware, Attorneys for Plaintiff 77 Charters, Inc.

John A. Sensing, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Greg S. Zucker, Esquire and Michael B. Weitman, Esquire of Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, Uniondale, New York, Attorneys for Defendants Jonathan D. Gould, Stonemar MM Cookeville, LLC, Cookeville Corridor, LLC and Eightfold Cookeville Investor, LLC.

**SLIGHTS, Vice Chancellor**

In 2007, three groups of investors acquired a shopping mall in Tennessee for $29,394,000. One of these investors, Plaintiff, 77 Charters, Inc. ("77 Charters"), contributed $1,211,717 to the venture in exchange for a non-preferred ownership interest. The second investor, Defendant, Jonathan D. Gould, indirectly held a similar non-preferred interest. Non-party, Kimco Preferred Investor LXXIII, Inc. ("Kimco"), received preferred interests. Among other rights, Kimco's preferred stake entitled it to receive a 9% annual rate of return on its investment before 77 Charters or Gould would receive any distributions. All parties agreed that Gould, and entities he controlled, would run the mall's day-to-day operations.

While 77 Charters' involvement with Gould and Kimco was limited to the mall in Tennessee, Kimco and Gould owned and operated malls throughout the Southeast. In 2013, without 77 Charters' knowledge and for reasons unpled, Kimco decided to shed these investments. This left Gould in need of a new preferred investor. To fill the role, he identified Defendant, Eightfold Cookeville Investor, LLC ("Eightfold"). Unbeknownst to 77 Charters, Gould, Kimco and Eightfold negotiated a three-step transaction whereby Eightfold ultimately acquired Kimco's interest in the mall.

*First*, Gould acquired Kimco's preferred investment for $1,995,283. This gave Gould sole control over the operating entity the parties had formed to hold and operate the mall. *Second*, Gould amended the operating entity's constitutive

1

documents to advantage the mall's preferred investors (i.e., himself) beyond the rights Kimco had enjoyed. Among other changes, Gould increased his distribution preference from a 9% rate of return to 12.5%. *Third*, Gould sold part of Kimco's interest to Eightfold for $1,995,283—the same price he paid for all of Kimco's interest—while retaining a slice of the preferred stake for himself.

By 2016, 77 Charters decided to investigate the status of its investment. Its efforts eventually led to a formal books and records demand in 2017 under 6 *Del. C.* § 18-305 of the Delaware Limited Liability Company Act (the "Act"). Just as it appeared 77 Charters would be receiving documents, in 2018, Gould and Eightfold agreed to sell the mall for $30,200,000. After paying off the mall's creditors, $4,768,045 was left over for distribution to preferred investors. 77 Charters received nothing.

In the wake of the sale, 77 Charters filed a complaint in this Court, which it later amended.[1] While creative minds can differ on how best to structure and plead a complaint, I have found 77 Charters' approach here to have made the task of discerning the precise nature of its legal claims quite difficult. 77 Charters structured its Complaint as a streaming narrative followed by a laundry list of claims that

---

[1] D.I. 1; First Am. Verified Compl. ("Compl.") (D.I. 25).

generally incorporate the narrative but do not state why or how the facts meet the *prima facie* elements of the claim asserted.

As best I can tell, 77 Charters' primary allegation is that Gould, and the entities he controlled, breached their fiduciary duties by acquiring Kimco's interest, amending the relevant operating agreement to benefit Gould and then selling the mall at a time and in a manner where he would recover his investment (and more) while leaving 77 Charters with nothing. In some instances, 77 Charters describes this chain of events from 2013 to 2018 as a *single* wrong; in others, it describes them as several "Wrongful Acts."[2]

To further complicate the Court's analysis, one of 77 Charters' "main target[s]" in this action is Gould, who was neither a member nor a manager of the mall's operating entity in his individual capacity.[3] Perhaps acknowledging that Gould's remote status would not give rise to traditional fiduciary duties, 77 Charters attempts to rest its claims upon the framework established in *USACafes, L.P. Litigation*,[4] where Chancellor Allen held remote "controllers" of an alternative entity

---

[2] *Compare* Compl. ¶ 3 (describing this chain of events as a single "deal"), *with* Compl. ¶ 93 (describing a long list of separate "wrongful acts").

[3] Oral Arg. on Defs.' Mot. to Dismiss First Am. Compl. ("Tr.") (D.I. 40) at 39.

[4] Compl. ¶ 104; *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991).

3

may owe limited fiduciary duties, the "full scope" of which the court did not "delineate."[5]

In addition to 77 Charters' claims against Gould and the entities he controls, 77 Charters also brings aiding and abetting, civil conspiracy, unjust enrichment and breach of contract claims against Eightfold. Again, the precise factual bases of these claims is difficult to make out.

All Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state viable claims (the "Motion").[6] For reasons explained below, after giving 77 Charters all fair and reasonable inferences, the Motion will be granted in part and denied in part. 77 Charters' efforts to loop Eightfold into its dispute with Gould fail as it is not reasonably conceivable that Eightfold was anything other than a third-party purchaser of Kimco's preferred interest. As for Gould and his entities, I am satisfied 77 Charters has well pled viable breach of fiduciary duty and civil conspiracy claims against these defendants. But only a narrow swath of the Complaint's enumerated "Wrongful Acts" is actionable as a matter of law.[7]

---

[5] *In re USACafes*, 600 A.2d at 49.

[6] D.I. 27.

[7] Compl. ¶ 93.

Based on the operating entity's constitutive documents, Gould's acquisition of the preferred interest, standing alone, could not have been wrongful as he (and his entities) had the contractual right to compete with 77 Charters for additional investments in the mall. Similarly, 77 Charters has not well pled a stand-alone breach of fiduciary duty claim arising out of the mall's sale in 2018. Gould's amendment of the operating agreement, however, is a different story. It is reasonable to infer Gould amended the mall's operating agreement in a self-dealing transaction that was not entirely fair to 77 Charters. Accordingly, this narrow aspect of 77 Charters' claims must survive Defendants' Motion.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[8] For purposes of the Motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in 77 Charters' favor.[9]

---

[8] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

[9] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

## A. Parties and Relevant Non-Parties

Nominal Defendant, Cookeville Retail Holdings, LLC ("Cookeville Retail"), is a Delaware limited liability company that was formed to invest in a retail shopping center located in Cookeville, Tennessee ("Jackson Plaza").[10] Cookeville Retail was formed on March 8, 2007, by (i) its managing member (nominal Defendant and Delaware limited liability company, Stonemar Cookeville Partners, LLC ("Stonemar Cookeville")) and (ii) its preferred member, Kimco.[11]

For its part, Stonemar Cookeville was formed on July 31, 2007, by (i) its managing member (Defendant, Stonemar MM Cookeville, LLC ("Stonemar MM")) and (ii) its non-managing members, one of which is 77 Charters.[12] Stonemar Cookeville is a special purpose entity formed "to hold direct or indirect investments in commercial real estate properties," but its main "objective . . . was to obtain financial distributions from Cookeville Retail."[13]

At the top of the organizational hierarchy sits Defendant, Jonathan D. Gould, a New York resident and managing member of Stonemar MM and Defendant,

---

[10] Compl. ¶ 1; Compl. Ex. C § 1.1 (definition of the "Project"), § 2.5 (Cookeville Retail's "purposes and scope" were "strictly limited" to acquiring and maintaining Jackson Plaza.).

[11] Compl. ¶¶ 1, 8, 19.

[12] Compl. ¶¶ 5, 7, 15.

[13] Compl. ¶¶ 15, 17–18.

Cookeville Corridor, LLC ("Cookeville Corridor").[14]  In addition to his interests in Stonemar MM and Cookeville Corridor, Gould is alleged to control Defendant, Stonemar Realty Management, LLC ("Stonemar Realty").[15]

Kimco is owned by non-party, Kimco Realty Corporation ("Kimco Realty"), a publicly-traded real estate investment trust.[16]  As noted, Kimco was a co-investor, along with Stonemar Cookeville, in Cookeville Retail.[17]  Apart from this investment, Kimco Realty had "other commercial dealings" with Gould, including malls in Kentucky and Mississippi.[18]

Eightfold's ownership structure is something of a mystery in the Complaint.[19] What is clear, however, is that Eightfold would eventually take Kimco's place as a preferred investor in Cookeville Retail.[20]  77 Charters does not allege Eightfold is owned or controlled by Gould.

---

[14] Compl. ¶¶ 3, 6–7, 10, 20.  Gould is alleged to be the "sole owner" of Cookeville Corridor. Compl. ¶ 10.

[15] Compl. ¶ 23.

[16] Compl. ¶¶ 19, 35, 63.

[17] Compl. ¶ 19.

[18] Compl. ¶ 35.

[19] *See, e.g.*, Compl. ¶ 63 ("It is unclear . . . whether Kimco Realty [] owns an interest in Eightfold.").

[20] Compl. ¶¶ 11, 36, 63.

The following chart depicts the relationships between the parties circa 2007:[21]



## B. The Basic Investment Structure

The parties structured their investments in Cookeville Retail so that 77 Charters would be a passive investor, while Gould and the entities under his control would oversee all of Jackson Plaza's operations.[22] With this structure as the

---

[21] Compl. ¶¶ 1–22.

[22] Compl. ¶ 24.

backdrop, Cookeville Retail purchased Jackson Plaza for ~$29,000,000 on August 9, 2007.[23] Of this purchase price, Cookeville Retail borrowed $24,380,000 (the "Loan").[24]

Cookeville Retail's Limited Liability Company Agreement provided that Stonemar Cookeville and Kimco would distribute returns on investments according to a waterfall.[25] At the Cookeville Retail level, any distributions would be allocated, first, to Kimco's preferred membership interests until it had received a specified preferred return of at least 9% on its capital contributions (the "Preferred Interest").[26] Then, excess returns would be distributed to Stonemar Cookeville and its members (including 77 Charters) who were, essentially, the residual equity holders in Jackson Plaza.[27]

In anticipation of Cookeville Retail's purchase of Jackson Plaza, Gould, acting through Stonemar MM and Stonemar Cookeville, caused Cookeville Retail to enter into a management and leasing agreement (the "Management Agreement") with Stonemar Realty where it was agreed that Stonemar Realty alone would manage

---

[23] Compl. ¶ 21.

[24] Compl. ¶ 22.

[25] Compl. ¶ 49; Compl. Ex. C § 8.2.

[26] Compl. ¶ 49; Compl. Ex. C § 8.2.

[27] Compl. ¶ 49.

Jackson Plaza's day-to-day operations.[28] According to 77 Charters, this arrangement caused it to be so far removed from Jackson Plaza's business that it had no knowledge of the Management Agreement or Cookeville Retail's operating agreement.[29]

## C. The Relevant Contracts

The principal agreements governing the relationship between 77 Charters, Kimco, Gould and the entities he controlled are the Limited Liability Company Agreement of Cookeville Retail Holdings LLC (the "CRA") and the Limited Liability Company Operating Agreement of Stonemar Cookeville Partners, LLC (the "SCA").[30] I summarize the key provisions of both agreements below.

### 1. The CRA

Two parties, Kimco and Stonemar Cookeville, executed the CRA in August 2007.[31] In keeping with Stonemar Cookeville's manager-managed structure, Section 4.1(a) provides, "Manager [(Stonemar Cookeville)] shall manage the affairs of the Company and shall have sole authority to bind and take any action on behalf

---

[28] Compl. ¶ 23.

[29] Compl. ¶ 25.

[30] *See* Compl. Ex. C (the "CRA"); Compl. Ex. B (the "SCA").

[31] CRA (recitals). The CRA defines Cookeville Retail's "Members" as Kimco and Stonemar Cookeville. CRA § 1.1 (definitions of "Members," "Developer Member" and "Kimco Member").

of the Company."[32]  In performing this role, the CRA obligates Stonemar Cookeville to manage Cookeville Retail "as would a prudent manager under similar circumstances" and "[to] conduct the ordinary business and affairs of the Company in accordance with good industry practice."[33]  At Section 4.7, the CRA expressly acknowledges that Cookeville Retail had entered into the Management Agreement with Stonemar Realty whereby Stonemar Realty would be paid "a monthly fee not to exceed 4% of collected rents" in exchange for its services.[34]

While Kimco and Gould were frequently co-investors in real estate projects, Section 4.9, captioned "Other Business Activities," preserves each Member's ability to invest and even compete with other parties to the CRA.[35]  Section 4.9 provides:

> each Member, Manager or Affiliate[36] thereof may engage in and possess interests in other business ventures . . . independently . . . including ones in direct or indirect competition with the Company, with

---

[32] Compl. ¶ 23; CRA § 4.1.

[33] CRA § 4.1(c).  If, however, a matter were subject to a vote of Cookeville Retail's members, Section 4.1(d) directs "Members" to "take into account the interests of the Company's creditors as well as the interests of its Members" when deciding how to vote. CRA § 4.1(d).

[34] CRA § 4.7.

[35] CRA § 4.9.

[36] The CRA defines an "Affiliate" to mean "with respect to a Person, another Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question." CRA § 1.1 (definition of "Affiliate"). The CRA defines a "Person" to mean "an individual or any entity of any type." *Id.*

11

no obligation to offer to the Company . . . the right to participate therein.[37]

The CRA limited Kimco and Stonemar Cookeville's ability to transfer their respective membership interests without the other's consent. Section 3.2, captioned "Dispositions of Membership Interests," provides, "No Member may Transfer all or any portion of its Membership Interest, except with the consent of the other Member," which may be "given or withheld in the other Member's sole and absolute discretion."[38] Along the same lines, under Article 12 of the CRA, captioned "Buy-Sell Option," either member could give "notice to the other Member . . . stating therein the aggregate dollar amount (the "Valuation Amount") which the Offeror would be willing to pay for all . . . of the assets of" Cookeville Retail.[39] Upon receiving this notice, the other member would have the option of either (i) selling "its entire Membership Interest" or (ii) purchasing "the entire Membership Interest of the Offeror" based on the valuation proposed by the offering-member.[40]

---

[37] CRA § 4.9.

[38] CRA § 3.2(ii), (iii).

[39] CRA § 12.1(b).

[40] CRA § 12.1(c).

## 2. The SCA

Stonemar MM and Stonemar Cookeville's minority members (including 77 Charters) executed the SCA in August 2007.[41] The SCA's recitals explain the agreement was "entered into . . . by and among" Stonemar MM as the "Managing Member" and "the other Persons who have executed this Agreement . . . (each, a 'Member' and, together with the Managing Member, the 'Members')."[42] As structured, Stonemar MM is both a "Member" and the "Managing Member" under the SCA.

To memorialize Stonemar MM's role as managing member, Section 6.1 of the SCA states, "[t]he business and affairs of the Company shall be managed by and under the exclusive direction of the Managing Member [(Stonemar MM)] and all powers of the Company may be exercised exclusively by the Managing Member."[43] Section 10.2, captioned "Liability and Indemnification," provides, "[t]o the fullest extent permitted by applicable law . . . no Person[44] acting in its capacity as a Member

---

[41] SCA (recitals and signature page).

[42] SCA (recitals).

[43] SCA § 6.1.

[44] Like the CRA, the SCA broadly defines a "Person" to include "any individual, corporation, . . . limited liability company . . . or other entity." SCA § 1.17.

(including the Managing Member and its Affiliates) shall be personally liable to the

Company or its members for money damages."[45]

Like the CRA, the SCA makes clear that members may compete with each

other and with the company. Section 10.4 provides:

> Each Member acknowledges that: (i) the other Members (including the Managing Member) and their respective Affiliates[46] have or may have other business interests . . . some of which may be in conflict or competition with the business of the Company . . . , and (ii) the Members and their Affiliates may engage in or possess an interest in any other business or venture of any kind. . . . Except as provided for herein, neither the Company nor any Member shall have any right, by virtue of this Agreement, in such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.[47]

The "business of the Company" with which Stonemar Cookeville's members are

entitled to compete is not defined in the SCA. The agreement, however, does define

Stonemar Cookeville's "purpose" as "mak[ing] direct or indirect investments in

commercial real estate properties."[48] In particular, Stonemar Cookeville's "initial

---

[45] SCA § 10.2(a).

[46] The SCA defines "Affiliate" to include "any Person or group of Persons . . . that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with [a] particular Person." SCA § 1.3.

[47] SCA § 10.4.

[48] SCA § 2.3.

investment" was meant to facilitate the acquisition of an indirect interest in Jackson Plaza.[49]

### D. The Kimco Interest Sale

From 2007 until 2013, Jackson Plaza operated under the structure described above, with Kimco receiving preferred distributions and the non-preferred investors receiving any distributions in excess of the Preferred Interest's guaranteed rate of return.[50]  But, on July 1, 2013, Kimco sold the Preferred Interest to Cookeville Corridor (the "Kimco Interest Sale").[51]  This transaction was part of Kimco's broader divestment of its real-estate interests, which implicated multiple properties where Gould and Kimco were co-investors.[52]

Ostensibly to avoid Jackson Plaza's sale at a depressed price, Gould caused Cookeville Corridor to pay Kimco $4,500,000 for its preferred stake in two separate properties.[53]  Of this purchase price, $1,995,283 was allocated to the Preferred Interest, with the balance going to an unrelated property in Kentucky.[54]  Through the

---

[49] SCA § 2.3.

[50] Compl. ¶¶ 23–24.

[51] Compl. ¶¶ 2, 31–32.

[52] Compl. ¶ 37.

[53] Compl. ¶¶ 2–3, 31–32.

[54] Compl. ¶¶ 2, 31–32.

Kimco Interest Sale, Gould positioned himself (albeit temporarily) to be in complete control of Cookeville Retail by joining the Preferred Interest with Stonemar Cookeville's non-preferred, managing interest.[55]

When Cookeville Corridor acquired the Preferred Interest, Gould had already identified Eightfold as a suitable preferred investor to carry on in Kimco's stead.[56] Immediately after Cookeville Corridor purchased the Preferred Interest, Gould caused Cookeville Retail, Stonemar Cookeville and Cookeville Corridor, along with Eightfold, to amend the CRA by entering into the Amended and Restated Limited Liability Company Operating Agreement (the "Amended CRA") on July 1, 2013.[57] Under the Amended CRA, Eightfold and Cookeville Corridor were admitted as members of Cookeville Retail.[58]

According to 77 Charters, the Amended CRA had a more sinister purpose than simply replacing Kimco with Eightfold. Specifically, it is alleged that Gould's stated purpose of "preventing the sale of Jackson Plaza" was just a "guise" for his true plan to "reward himself through a Rube Goldberg contraption."[59] According to 77

---

[55] Compl. ¶¶ 37–38; CRA (recitals).

[56] Compl. ¶ 38.

[57] Compl. ¶ 43; Compl. Ex. D.

[58] Compl. ¶ 43; Amended CRA § 1.2.

[59] Compl. ¶ 3.

16

Charters, the Amended CRA was the foundation for the "contraption" that allowed Gould to extract value from Cookeville Retail at 77 Charters' expense.[60] For example, Gould used his newfound control of Cookeville Retail to enhance the Preferred Interest's annual returns from 9% to 12.5%.[61] Gould also caused Stonemar Cookeville, as managing member, to be subjected to a lower standard of care in the Amended CRA than was embedded within the original CRA.[62]

With Kimco's exit, it is alleged that Gould seized an opportunity to restructure Cookeville Retail's distribution scheme at 77 Charters' expense.[63] Of Kimco's total capital account balance at the time of the Kimco Interest Sale ($3,927,016), Cookeville Corridor kept $1,931,733 (the "Retained Interest"),[64] while passing on the remainder ($1,995,283) to Eightfold (the "Eightfold Interest").[65] Even though Eightfold received only a portion of the Preferred Interest, Eightfold paid Cookeville

---

[60] Compl. ¶ 49.

[61] Compl. ¶¶ 43, 49. Here, I note the parties dispute the Preferred Interest's rate of return under the CRA. *Compare* Defs.' Opening Br. in Supp. of Mot. to Dismiss First Am. Verified Compl. ("DOB") at 35 n.10 (7%), *with* Compl. ¶ 49 (9%). I do not resolve this dispute as Defendants concede "there may have been differences between the agreements' 'waterfall' structures." DOB at 34.

[62] Compl. ¶ 51.

[63] Compl. ¶¶ 32, 38–39, 49.

[64] The Complaint vaguely describes the retained capital account balance as "a retained right to potential distributions to the extent, if any." Compl. ¶ 38 (sic).

[65] Compl. ¶¶ 32, 38–39.

Corridor $1,995,283 for the Eightfold Interest (the same price Cookeville Corridor paid for the entire Preferred Interest).[66] Under this new structure, the Retained Interest entitled Cookeville Corridor to receive a portion of Cookeville Retail's preferred distributions with Eightfold.[67]

As a minority investor in Stonemar Cookeville, 77 Charters was not a party to either the CRA or the Amended CRA.[68] Given this status, despite the transformative nature of the Kimco Interest Sale and Eightfold's admission as a new preferred investor, 77 Charters alleges it had no notice of the Kimco Interest Sale or Stonemar Cookeville's consent to the transaction.[69]

### E. 77 Charters' Books and Records Action and the Jackson Plaza Sale

By May 2016, roughly three years after the Kimco Interest Sale, 77 Charters eventually became "concerned" enough about its investment to make informal requests for documents from Stonemar Cookeville.[70] Frustrated with the response, 77 Charters formalized its request for information with a demand under 6 *Del. C.*

---

[66] Compl. ¶¶ 32, 38–39.

[67] Compl. ¶ 49. To effectuate the Kimco Interest Sale, Gould, acting as managing member of Stonemar MM, caused Stonemar Cookeville to consent to the transaction under Section 3.2 of the CRA. Compl. ¶¶ 31–32, 40.

[68] Compl. ¶¶ 33, 44.

[69] Compl. ¶ 33.

[70] Compl. ¶ 54.

§ 18-305.[71] Still dissatisfied with Stonemar Cookeville's response, 77 Charters filed a books and records action on February 14, 2018.[72] That action ended on June 12, 2018, with 77 Charters' voluntary dismissal as part of a settlement that allowed 77 Charters to inspect certain Stonemar Cookeville documents.[73]

Shortly after this settlement, and without 77 Charters' advance knowledge, on June 27, 2018, Cookeville Retail sold Jackson Plaza to a third party for a purchase price of $30,200,000 (the "Jackson Plaza Sale").[74] Gould signed a written consent on behalf of Stonemar MM, Stonemar Cookeville and Cookeville Corridor authorizing the transaction.[75]

77 Charters learned of the Jackson Plaza Sale in a letter from Gould in which Gould advised that the sale proceeds were "insufficient to return any funds to 77 Charters."[76] The first $24,926,268 of the sale proceeds were used to repay the Loan with the remaining $4,768,045 going to Cookeville Retail.[77] Gould's letter

---

[71] Compl. ¶ 54.

[72] Compl. ¶ 55. *See 77 Charters, Inc. v. Stonemar Cookeville P'rs, LLC*, C.A. No. 2018-0126-AGB.

[73] Compl. ¶ 56.

[74] Compl. ¶ 57.

[75] Compl. ¶ 59.

[76] Compl. ¶ 63.

[77] Compl. ¶¶ 64, 70.

19

stated that this balance was then distributed to "Kimco Realty Corp."[78] Notwithstanding this representation, 77 Charters alleges, on information and belief, that this sum actually went to Eightfold and Cookeville Corridor (in unspecified proportions).[79] No distribution was made to Stonemar Cookeville.[80]

### F. Procedural Posture

77 Charters filed its original complaint on February 18, 2019.[81] After Defendants filed a motion to dismiss, 77 Charters responded by amending its pleading with the now-operative Complaint.[82] In the Complaint, 77 Charters alleges Gould caused entities under his control to engage in ten "Wrongful Acts," which can be grouped into four categories:[83]

- **Business opportunity claims:** causing Stonemar Cookeville to agree to the Kimco Interest Sale and admitting Eightfold as a member while "seiz[ing] the opportunity of the Stonemar Cookeville members to purchase [the Preferred Interest] pursuant to Stonemar Cookeville's option to buy and as otherwise available as a business opportunity to Stonemar Cookeville members";[84]

---

[78] Compl. ¶ 63.

[79] Compl. ¶¶ 2, 66.

[80] Compl. ¶¶ 2, 67.

[81] D.I. 1.

[82] D.I. 10; D.I. 25.

[83] Compl. ¶ 93.

[84] Compl. ¶ 93(b)–(c).

- **Wrongful charter amendment:** causing Stonemar Cookeville to enter the Amended CRA, which included terms more beneficial to Cookeville Corridor and Eightfold than were provided to Kimco under the CRA;[85]

- **Jackson Plaza Sale:** causing Stonemar Cookeville to agree to both the Jackson Plaza Sale for an unfair price and the subsequent "improper distributions of proceeds from the sale of Jackson Plaza";[86]

- **Management Agreement:** Causing Stonemar Cookeville to enter into the Management Agreement on behalf of Cookeville Retail and, pursuant to those agreements, "engaging in transactions which were not arms' length transactions" and were not entirely fair.[87]

Based on these Wrongful Acts, 77 Charters brings (i) breach of contract claims against Cookeville Corridor, Eightfold and Stonemar MM (Counts VII and X),[88] (ii) direct and derivative breach of fiduciary duty claims against Stonemar MM, Stonemar Cookeville and Gould (Counts I–III),[89] (iii) aiding and abetting breach of fiduciary duty claims against Gould, Eightfold and Stonemar MM (Counts IV and XI),[90] (iv) a civil conspiracy claim against Gould, Stonemar MM, Cookeville Corridor and Eightfold (Count V),[91] (v) an unjust enrichment claim against Gould,

---

[85] Compl. ¶ 93 (d)–(f).

[86] Compl. ¶ 93 (g)–(h).

[87] Compl. ¶ 93(a).

[88] Compl. ¶¶ 127–32, 144–60.

[89] Compl. ¶¶ 81, 89–109.

[90] Compl. ¶¶ 110–17, 153–60.  Count XI is pled in the alternative.

[91] Compl. ¶¶ 118–20.

Stonemar MM, Cookeville Corridor and Eightfold (Count VI),[92] (vi) a tortious interference with business relations claim against Gould, Cookeville Corridor and Eightfold (Count VIII)[93] and (vii) a claim seeking a judgment declaring the Amended CRA is void (Count IX).[94]

On September 6, 2019, Defendants filed the Motion in which they seek an order dismissing all counts of the Complaint with prejudice under Court of Chancery Rule 12(b)(6).[95]

## II. ANALYSIS

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court applies a well-settled standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the Plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[96]

---

[92] Compl. ¶¶ 121–26.

[93] Compl. ¶¶ 133–39.

[94] Compl. ¶¶ 140–43.

[95] D.I. 40.

[96] *Savor*, 812 A.2d at 896–97 (citations omitted).

On top of the convoluted structure of 77 Charters' pleading, and the sheer breadth of its claims, outright mistakes in the Complaint (which 77 Charters characterizes as "scriveners errors") have made deciding the Motion extraordinarily difficult.[97] Against the backdrop of the Complaint's disorganization, I begin my analysis with the first argument 77 Charters makes in its Answering Brief—that it has well-pled Defendants wrongfully "usurp[ed] [a] business opportunity."[98] Even for this opening scene, however, 77 Charters has forgotten its lines. Notwithstanding its repeated characterization of its allegations as "business opportunity" claims, at oral argument, 77 Charters' counsel changed course and argued that what 77 Charters has actually alleged is "[what] I would say in the classic sense [is] self-dealing."[99]

While the Complaint has done as much to obscure as it has to expose a claim, giving 77 Charters the benefit of all reasonable inferences, I am satisfied the Complaint gives Defendants fair notice of a reasonably conceivable claim that

---

[97] *See, e.g.*, Compl. ¶¶ 133, 140 (The Complaint has two Count VIIIs.); Compl. ¶ 140 (The second Count VIII (*i.e.*, Count IX) is labeled "Tortious Interference" when it is a claim seeking declaratory judgment.); Compl. ¶¶ 144, 151 (Count X—which is brought only against Cookeville Corridor and Eightfold—alleges "Stonemar MM caused Stonemar Cookeville and Cookeville Retail to agree to terms of payment and to pay Stonemar Realty . . . in excess of what was permitted."); Pl.'s Answering Br. in Opp'n to Mot. to Dismiss First Am. Verified Compl. ("PAB") at 72 (referencing yet another mistake).

[98] PAB at 21; Compl. ¶¶ 32, 34, 93(c).

[99] *See* Compl. ¶¶ 3, 32, 93(c); Tr. at 33.

Stonemar MM and Gould breached their fiduciary duties by engaging in self-dealing when adopting the Amended CRA. Based on this conclusion, I also find 77 Charters has well pled the *prima facie* elements of civil conspiracy against Cookeville Corridor—as well as a claim seeking reformation of the Amended CRA. All remaining claims, however, must be dismissed for failure to state viable claims.

## A. 77 Charters Has Well Pled a Breach of Fiduciary Duty Against Gould and Stonemar MM (Counts I, II and III)

In Counts I, II and III, 77 Charters alleges Gould and Stonemar MM (the "Fiduciary Defendants"), as well as Stonemar Cookeville, breached their fiduciary duties by engaging in the Wrongful Acts.[100] Both Stonemar Cookeville and Cookeville Retail are Delaware LLCs and, as such, the Act permits their respective members to "expand or restrict" the "member's or manager's . . . duties."[101] Given the centrality of the operating agreement in governance disputes involving alternative entities, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law,

---

[100] Compl. ¶¶ 89–109.

[101] 6 *Del. C.* §§ 18-1101(c), 18-1104; *CHS Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 (Del. Ch. Apr. 21, 2015); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006).

a fiduciary relationship."[102] And, because a LLC agreement is a contract, its interpretation is generally subject to ordinary contract law principles.[103]

Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty.[104] "Although fiduciary duties may be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive."[105] Indeed, it is now settled in this court that the removal of default fiduciary duties through an LLC agreement must be accomplished with clear and unambiguous language.[106]

With these settled principles in mind, the first step in my analysis of each of the fiduciary duty claims is to construe the terms of the CRA and SCA against the backdrop of the applicable default rules to discern (i) which, if any, of the Defendants would owe fiduciary duties, (ii) whether default fiduciary duties have

---

[102] *Douzinas*, 888 A.2d at 1149–50; *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *1 (Del. Ch. May 7, 2008) (observing that "[c]ontractual language defines the scope, structure, and personality of limited liability companies").

[103] *Domain Assocs., L.L.C. v. Saha*, 2018 WL 3853531, at *18 (Del. Ch. Aug. 13, 2018).

[104] 6 *Del. C.* § 18-1104; *CHS Theatres*, 2015 WL 1839684, at *11.

[105] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014).

[106] *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) (citing *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012)).

been waived or modified by contract and (iii) whether the Complaint well pleads a breach of those duties.

## 1. It Is Reasonably Conceivable Stonemar MM and Gould Owe Default Fiduciary Duties

There appears to be no question that Stonemar MM owes default fiduciary duties as managing member of Stonemar Cookeville.[107]  As for Gould (Count I), although he is neither member nor manager of Stonemar Cookeville or Cookeville Retail, this court has held, under certain circumstances, that second-tier controllers may owe limited fiduciary duties.[108]  *USACafes* recognizes remote controllers (such as Gould) will owe *limited* fiduciary duties *if* they "exert control over the assets of that entity."[109]  The Complaint adequately pleads a remote controller scenario by alleging that Gould personally undertook all the Wrongful Acts as Stonemar MM's

---

[107] *Feeley*, 62 A.3d at 660 ("Numerous Court of Chancery decisions hold that the manager of an LLC owes fiduciary duties.").

[108] *See In re USACafes*, 600 A.2d 43.  Under a "traditional approach," only Stonemar MM would owe fiduciary duties to Stonemar Cookeville which, in turn, would owe fiduciary duties to Cookeville Retail.  *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *20 (Del. Ch. Sept. 27, 2000); *Metro Ambulance, Inc. v. E. Med. Billing*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) (noting that those who traditionally have been recognized to owe fiduciary duties are those who occupy a special relationship of trust with another who relies upon his judgment, such as trustees, executors, directors and officers).

[109] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9–10 (Del. Ch. Apr. 20, 2009) (applying "*USACafes*-type liability" in a LLC context); *Feeley*, 62 A.3d at *667 (holding *USACafes* duties do not include the duty of care and have only been extended to "classic self-dealing" transactions) (quoting *In re USACafes*, 600 A.2d at 49).

manager.[110]  Defendants appear to concede as much by not challenging whether Gould owes default fiduciary duties in their briefs.[111]

Turning to Count II, in a turn that would make Fielding Mellish proud, 77 Charters attempts to bring a derivative breach of fiduciary duty claim *against* nominal Defendant, Stonemar Cookeville, while, at the same time, purporting to bring claims *on behalf of* Stonemar Cookeville.[112]  77 Charters' counsel conceded at oral argument that he "didn't know" of a case where this court had sanctioned a plaintiff derivatively "representing" an entity while "going after" the same entity as defendant in the same case.[113]  Enough said.  Count II must be dismissed.[114]

---

[110] *See, e.g.*, Compl. ¶ 37 ("Gould [] caused Cookeville Retail to transfer to Kimco cash and rent receivables."), ¶ 38 ("Gould caused Cookeville Corridor to transfer to Eightfold all of its membership interests in Cookeville Retail."), ¶ 40 ("Gould, as managing member of Stonemar MM, caused Stonemar Cookeville to approve the transfer by Cookeville Corridor."), ¶ 43 ("Gould, acting on behalf of (i) Stonemar MM as managing member of Stonemar Cookeville; and (ii) Cookeville Corridor caused Cookeville Retail to enter into [the Amended CRA].").

[111] *See* DOB at 45–46 (making other arguments).

[112] Compl. ¶¶ 90, 99, 102, 106.

[113] Tr. at 38–39.  Defendants raised this issue in their Opening Brief, arguing Stonemar Cookeville's "position in this litigation is properly one of neutrality."  DOB at 44.  In its Answering Brief, 77 Charters attempted to clarify that its claim against "nominal defendant Stonemar Cookeville" is based on its status as a "vehicle through which" Stonemar MM and Gould "engaged in their wrongful conduct."  PAB at 55–56; Compl. ¶ 99.  Giving 77 Charters all reasonable inferences, I see no basis in law or pled facts to impose a fiduciary duty upon Stonemar Cookeville, much less to infer that it breached such duty.

[114] Tr. at 39.  Once one accepts the nebulous fiduciary duty framework established in *USACafes*—which is focused on "the individuals" who ultimately "control" an alternative entity—it makes little sense for 77 Charters to bring claims against nominal Defendant,

## 2. The SCA Modifies Default Fiduciary Duties

The next step in the analysis is to decide whether the SCA or the CRA clearly and unambiguously modifies or waives the Fiduciary Defendants' default fiduciary duties.[115]   Because Delaware law recognizes the primacy of contract when addressing governance issues in the alternative entity space, 77 Charters may not saddle Defendants with common law fiduciary duties if doing so would contradict the plain language of the relevant LLC agreement.[116] On the other hand, if the parties have not unambiguously disavowed common law fiduciary duties, I must look to corporate law principles by analogy when determining whether and to what extent fiduciary duties are owed.[117]

Under normal circumstances, one would look to the operating agreement of the entity from which the fiduciary duties would naturally flow to determine whether

Stonemar Cookeville.  *See Lewis v. AimCo Prop., L.P.*, 2015 WL 557995, at \*5 (Del. Ch. Feb. 10, 2015) (noting that *USACafes* is concerned with practical "control" over alternative entities).

[115] *See Feeley*, 62 A.3d at 664 ("Drafters of an LLC agreement must make their intent to eliminate fiduciary duties plain and unambiguous.") (citation omitted).

[116] *See* 6 *Del. C.* §§ 18-1101(c), (e); *Fisk Ventures LLC*, 2008 WL 1961156, at \*8 ("In the context of [LLCs], which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC Agreement or some other contract."); *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at \*8 (Del. Ch. July 23, 2010) ("When . . . parties . . . cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default.").

[117] *Obeid v. Hogan*, 2016 WL 3356851, at \*6 (Del. Ch. June 10, 2016).

default duties had been modified.[118]  It is not so simple here, however, because applying *USACafes*-type fiduciary duties "puts [fiduciaries] in the situation of having potentially conflicting and irreconcilable fiduciary duties."[119]  On this record, it is unclear whether the Fiduciary Defendants should look to the SCA or the CRA as the source of the applicable standard of conduct.

Stopping short of grappling with whatever cognitive dissonance *USACafes* may engender, at this juncture, it is enough to say second-tier controllers "cannot be held liable for breach of fiduciary duty in a situation where the [core fiduciary (i.e., Stonemar MM)] because of its compliance with [its contractual fiduciary duties], does not owe such liability."[120]  In other words, given that Stonemar Cookeville and Cookeville Retail are creatures of contract, 77 Charters cannot agree contractually to lower Stonemar MM and its affiliates' standard of care in the SCA and then resurrect heightened standards of care for the Fiduciary Defendants based

---

[118] 6 *Del. C.* § 18-1101(c); *see, e.g.*, *Bay Ctr.*, 2009 WL 1124451, at *8.

[119] *Bay Ctr.*, 2009 WL 1124451, at *9 n.44 (alteration in original and quotation omitted); *Gelfman v. Weeden Inv'rs, L.P.*, 792 A.2d 977, 992 n.24 (Del. Ch. 2001); *Feeley*, 62 A.3d at 671 (observing that the Delaware Supreme Court could reject *USACafes* by holding "that when parties bargain for an entity to serve as the fiduciary, that entity is the fiduciary, and the parties cannot later circumvent their agreement by invoking concepts of control or aiding and abetting," but ultimately deferring to *USACafes* as "*stare decisis*").

[120] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 795 A.2d 1, 34 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 160 (Del. 2002).

upon the CRA, an agreement to which 77 Charters and the Fiduciary Defendants *are not parties*.[121]

With this in mind, I approach the fiduciary duty analysis in three steps. *First*, I address Defendants' argument that Section 10.2 of the SCA exempts the Fiduciary Defendants from monetary liability.[122] *Second*, I consider whether Section 10.4 of the SCA clearly and unambiguously eschews the corporate opportunity doctrine. Finally, I review 77 Charters' effort to require Stonemar MM to share corporate opportunities based upon the CRA, even if the SCA waives the corporate opportunity doctrine.

Section 10.2(a) of the SCA exempts any "Person acting in its capacity as a Member (including the Managing Member and its Affiliates)" from personal liability "to the Company or its members for money damages."[123] As noted, the SCA provides that Stonemar MM is both "Member" and "Managing Member" of Stonemar Cookeville.[124]

---

[121] *Fisk Ventures LLC*, 2008 WL 1961156, at *8; *Related Westpac*, 2010 WL 2929708, at *8.

[122] *See* DOB at 18.

[123] SCA §§ 1.17, 10.2; 6 *Del. C.* § 10-1101(e) (authorizing such a provision).

[124] SCA (recitals).

Predictably, the parties interpret the scope of Section 10.2's exculpation differently. Defendants contend it exempts the Fiduciary Defendants from the threat of monetary liability acting in *any* "capacity."[125]  If true, all counts in the Complaint—save Count 9—would be barred as each seeks money damages.[126]  For its part, 77 Charters concedes Section 10.2(a) exempts Stonemar MM from the threat of monetary damages when acting *as a member*, but, when wearing its *managing member* hat, 77 Charters argues the SCA does not shield Stonemar MM and its affiliates from money damages.[127]

Reading the SCA holistically, multiple provisions in the agreement support 77 Charters' reading.[128]  *First*, the SCA defines Stonemar MM as *both* a "Member" and as the "Managing Member."[129]  *Second*, Section 10.2(b), itself, differentiates between Stonemar MM acting as a "Member" and as the "Managing Member" when

[125] See DOB at 18–20.

[126] DOB at 18–20 (citing Compl. ¶¶ 69–70, 94).

[127] PAB at 18.

[128] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (holding that contracts must be read "as a whole" to "give each provision and term effect, so as not to render any part of the contract mere surplusage") (internal quotation omitted); SCA § 5.1 (discussing each "Member's" capital account); SCA § 6.1 (discussing Stonemar MM's role as managing member).

[129] "This . . . Agreement of Stonemar Cookeville Partners . . . is entered into . . . by and among Stonemar MM . . . (the 'Managing Member') and the other Persons who have executed this Agreement . . . (each, a 'Member.'". SCA (Recitals).

31

it describes the circumstances under which parties to the SCA could seek indemnification.[130]  That the SCA's drafters "knew how" to and, in fact, did distinguish between Stonemar MM's role as a "Member" and as "Managing Member" (yet they chose not to in Section 10.2(a)) lends credence to 77 Charters' proffered interpretation.[131]

77 Charters' interpretation is reasonable.  Accordingly, even if Defendants' interpretation is also reasonable (which I do not decide), Section 10.2(a) is not a basis to bar the claims in the Complaint, at least not at this stage.[132]

Turning to the parties' second dispute, I am satisfied the SCA unambiguously eschews the corporate opportunity doctrine.[133]  The contractual provision most directly on point is Section 10.4, captioned "Duties and Conflicts," where the parties acknowledge:

---

[130] SCA § 10.2(b).  Generally, Stonemar Cookeville would indemnify its members from liability incurred "in connection with" its business.  But Stonemar Cookeville would *not* indemnify a member if it were sued by another member—*unless* a member was suing Stonemar MM "*in its capacity as the Managing Member.*"  *Id.* (emphasis supplied).

[131] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360, 364 (Del. 2013) (interpreting a contract according to its "plain meaning" when read "as a whole" and declining to infer that the challenged language resulted from "sloppy drafting" when the agreement's drafters "knew how to impose an affirmative obligation when they so intended").

[132] *See Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1280, 1289 (Del. 2007) (stating a court, in deciding a Rule 12(b)(6) motion to dismiss, "cannot choose between two differing interpretations of ambiguous documents" where "the provisions in controversy are reasonably susceptible to different interpretations").

[133] DOB at 24–26.

**the other Members** (including the Managing Member [Stonemar MM]) **and** [its] respective **Affiliates** have or **may have other business interests [] and investments, some of which may be in conflict or competition with the business of the Company** . . . . and pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.[134]

77 Charters contends Section 10.4 is vague and not intended to govern situations "like the Kimco Interest Sale."[135] It says the section applies only to investments in "other similarly situated shopping centers."[136] On the other hand, Defendants argue the provision evidences the parties' clear and unambiguous choice to reject the corporate opportunity doctrine, thereby permitting Cookeville Corridor's acquisition of the Preferred Interest.[137]

Defendants' reading of Section 10.4 is the only reasonable interpretation. Returning to the plain language of Section 10.4, 77 Charters consented to Stonemar MM and its Affiliates having "business interests" and "investments" that are "in conflict" or in "competition with the business of" Stonemar Cookeville.[138] In turn, Section 2.3 states Stonemar Cookeville's "sole object and purpose" is to "make

---

[134] SCA § 10.4 (emphasis supplied).

[135] PAB at 27.

[136] *Id.*

[137] DOB at 24–46.

[138] SCA § 10.4; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (observing that, under Delaware law, courts "interpret clear and unambiguous contract terms according to their plain meaning").

direct or indirect investments in commercial real estate properties," particularly "to acquire, hold, own and/or dispose of a limited liability company interest in" Cookeville Retail.[139]

The plain import of Section 10.4 is that 77 Charters unambiguously agreed to waive the corporate opportunity doctrine. This waiver, when read in conjunction with Section 2.3, allows Stonemar MM and its affiliates to "conflict" and "compete" with Stonemar Cookeville's business of investing in commercial real estate, including its investment in Cookeville Retail.[140] The only reasonable interpretation of this provision is that Stonemar MM and its affiliates have no obligation to share additional opportunities to invest in Cookeville Retail should such opportunities become available.[141]

Finally, while not entirely clear from its Answering Brief, 77 Charters attempts to bypass the SCA and re-animate the corporate opportunity doctrine by arguing "Gould and Stonemar MM were required to consider the interests of Stonemar Cookeville (and its members) in approving the Kimco Interest Sale, pursuant to . . . the CRA."[142] To support this proposition, 77 Charters cites

---

[139] SCA § 2.3.

[140] SCA § 10.4.

[141] SCA § 2.3.

[142] PAB at 21–22, 28, 31.

Section 4.1(d) of the CRA, obligating *Stonemar Cookeville* to "discharge its duties in a good and proper manner . . . as would a prudent manager under similar circumstances" and to "take into account the interests of [Cookeville Retail's] creditors as well as the interests of its Members [(i.e., Kimco and Stonemar Cookeville)]."[143]

77 Charters' Frankensteinian effort to reanimate contractually snuffed corporate opportunity liability fails for three reasons.[144] *First*, 77 Charters cannot use the CRA to resurrect a duty to present corporate opportunities to Stonemar Cookeville when 77 Charters unambiguously waived this duty in the SCA.[145] *Second*, even if I were inclined to read the SCA and the CRA together to determine the scope of the Fiduciary Defendants' "*USACafes*-type" fiduciary duties, Section 10.4 of the SCA *specifically* and unambiguously disavows the corporate opportunity doctrine.[146] This provision's "specific language . . . controls over general language . . . and where specific and general language conflict, the specific

---

[143] CRA § 4.1(c), (d).

[144] At the outset, I note it is disingenuous for 77 Charters to argue it relied on the CRA's terms since it pleads it had no knowledge of the CRA's terms until 2016. Compl. ¶ 33.

[145] *Gotham P'rs*, 795 A.2d at 34 (refusing to allow a *USACafes*-type fiduciary duty claim against a second-tier controller where the core fiduciary (in this case Stonemar MM) complied with the constitutive agreement to which it was a party).

[146] SCA § 10.4.

provision [] qualifies the meaning of the general one."[147]  *Third*, Section 4.9 of the CRA provides that Cookeville Retail's members and their respective affiliates have the right directly and indirectly to compete with Cookeville Retail.[148]  In other words, far from bringing corporate opportunities back to life, the CRA, like the SCA, makes clear that the corporate opportunity doctrine does not dwell in the realm of Stonemar Cookeville's governance regime.[149]

*****

Construing both the SCA and the CRA according to their plain meaning, the parties unambiguously eschewed the corporate opportunity doctrine while leaving other default aspects of the duty of loyalty intact.[150]  And, while the SCA exempts

---

[147] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005); *Ivize of Milwaukee, LLC v. Compex Litig. Supp., LLC*, 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009) ("[W]ell settled rules of contract construction require that, in a conflict between provisions, the more specific language should control.").

[148] CRA § 4.9.

[149] *Compare* CRA § 4.9 ("each Member, Manager or Affiliate . . . may engage in and possess interests in other business ventures . . . including ones in direct or indirect competition with the Company."), *with* SCA § 10.4. ("Each Member acknowledges that: (i) the other Members (including the Managing Member) and their respective Affiliates . . . may have other business interests . . . some of which may be in conflict or competition with the business of the Company.").

[150] *See Science Accessories Corp. v. Summagraphics Corp.*, 453 A.2d 957, 963 (Del. 1980) ("The doctrine of corporate opportunity is [but] a species of the duty of a fiduciary to act with undivided loyalty."); *Skye Mineral Inv'rs, LLC v. Clarity Copper*, 2020 WL 881544, at *22 (Del. Ch. Feb. 24, 2020) (interpreting similar language to eschew the corporate opportunity doctrine while leaving open the possibility that a breach "exceeds the scope of behavior the corporate opportunity doctrine prohibits").

its members from monetary liability, it does *not* unambiguously exempt Stonemar MM and its affiliates from the threat of monetary liability for Stonemar MM's actions as Stonemar Cookeville's managing member.

### 3. 77 Charters Has Well Pled a Narrow Breach of *USACafes*-type Fiduciary Duties Against the Fiduciary Defendants

Having decided the SCA and the CRA leave parts of the duty of loyalty intact, I turn next to whether 77 Charters has well pled that the Fiduciary Defendants breached their fiduciary duties by engaging in the Wrongful Acts.[151] At the outset, I note it is reasonably conceivable the Wrongful Acts implicate conduct while Stonemar MM was wearing its managing member "hat" since they involve acts only the managing member was authorized to take under the SCA.[152] Accordingly, Section 10.2(a) is not a defense for Stonemar MM or Gould at the pleading stage.

77 Charters urges the Court to infer the Fiduciary Defendants breached their fiduciary duties when Cookeville Corridor acquired the Preferred Interest without first offering it to 77 Charters.[153] Here, the relevant question is whether Cookeville Corridor's acquisition of the Preferred Interest was in "conflict" or "competition"

---

[151] Compl. ¶¶ 89–95, 103–09.

[152] *See* SCA §§ 6.1–6.2 (the managing member "exclusively" exercised "all powers of the Company."); *see, e.g.*, Compl. ¶ 92 (alleging Stonemar MM breached its fiduciary duties by "causing Stonemar Cookeville to agree to the Kimco Interest Sale").

[153] Compl. ¶¶ 93(b)–(c), 106.

with Stonemar Cookeville's business of holding limited liability company interests in Cookeville Retail.[154]  Literally, the answer must be *yes*.  To the extent Stonemar Cookeville was a potential bidder for the Preferred Interest, once Kimco decided to sell, the Fiduciary Defendants competed with Stonemar Cookeville when they made their bid.

As already discussed at some length, however, the SCA unambiguously forecloses the notion that the Fiduciary Defendants had a common law duty to present the Preferred Interest to Stonemar Cookeville before Cookeville Corridor acquired it.[155]  This is true even *assuming arguendo* that Stonemar Cookeville had an interest or expectancy in the Preferred Interest.[156]  Any other reading would undermine the purpose of a contractual waiver of the corporate opportunity doctrine which applies precisely when an entity has such an interest or expectancy.[157]

---

[154] SCA §§ 2.3, 10.4.

[155] *See CelestialRX*, 2017 WL 416990, at \*17–18 (interpreting similar language to "eschew[] the corporate opportunity doctrine"); *Kahn v. Ichan*, 1998 WL 832629, at \*3 (Del. Ch. Nov. 12, 1998) (interpreting similar language and holding "where a partnership, by virtue of an unambiguous clause in its partnership agreement [] authorizes competition with the partnership," its partners are "on notice that the partners intend to compete directly with the partnership").

[156] *See* Compl. ¶ 32 (alleging Stonemar Cookeville had an "interest and/or expectancy" to purchase the Preferred Interest "pursuant to Article 12" and "section 3.2" of the CRA).

[157] *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996) (stating the corporate opportunity doctrine applies when a fiduciary usurps an opportunity within the corporation's line of business, that the corporation is financially able to exploit, in which

Accordingly, as already stated here, it is not reasonably conceivable that Cookeville Corridor's acquisition of the Preferred Interest, standing alone, constitutes a breach of fiduciary duty.

This, however, does not end the analysis. As Defendants concede, the Kimco Interest Sale was not a simple "pass through" transaction.[158] 77 Charters has not just alleged Gould acquired the Preferred Interest. Rather, the Complaint alleges, albeit obliquely, that Gould acquired the Preferred Interest and then used his total voting control over Cookeville Retail to amend the CRA for his own benefit.[159] A reasonable inference that flows from this allegation is that, before the Kimco Interest Sale, Gould and 77 Charters' interests were aligned as non-preferred investors in Cookeville Retail.[160] But, when Gould acquired the Preferred Interest through Cookeville Corridor, he selfishly amended the CRA and shifted economic value toward Cookeville Corridor and away from 77 Charters.[161] For example, 77 Charters alleges the Amended CRA exempted Gould (and entities under his control) from traditional fiduciary duties to a greater extent than the CRA and then

the corporation has an interest or expectancy and, by taking, the fiduciary is placed in a position inimicable to his fiduciary duties).

[158] Tr. at 15.

[159] Compl. ¶¶ 93(d), 99–100, 106.

[160] Compl. ¶¶ 37–38, 45, 49.

[161] *See* Compl. ¶¶ 31, 37–39, 46, 49, 93, 106.

provided preferred investors a higher guaranteed return under the waterfall than they were entitled to before (12.5% versus 9%).[162]

While the scope of *USACafes*-type liability is limited, "it surely entails the duty not to use control over [an entity] to advantage the [controller] at the expense of" the controlled-entity.[163] Such a circumstance is well pled here, albeit just so. The Complaint supports a reasonable inference Gould (i) acquired the Preferred Interest, (ii) executed the Amended CRA to increase the Preferred Interest's economic value at 77 Charters' expense and (iii) sold a slice of the augmented

---

[162] Compl. ¶¶ 49, 51; DOB at 34–35 (conceding "there may have been differences between the agreements' 'waterfall' structures"). At this juncture, I note the parties dispute whether the standards of care provided in the CRA and the Amended CRA were materially different. *Compare* Amended CRA § 8.1(b) ("The obligations of [Stonemar Cookeville] as Managing Member under this agreement are not fiduciary obligations to the extent such obligations can be waived under applicable law."), *and* Amended CRA § 8.3 ("[T]he Stonemar Member shall at all times act in good faith . . . [and] carry out all of its obligations under this Agreement in accordance with the Standard of Care."), *and* Amended CRA Schedule C (defining "Standard of Care" to include "the usual and customary standard of care, skill, prudence and diligence employed by asset managers in accordance with the exercise of sound and prudent business judgment"), *and* Amended CRA § 8.6.5 ("[N]o direct or indirect officer, director, shareholder, partner, employee or agent of any Member of the Company shall have any liability of any kind or nature under this agreement."), *with* CRA § 4.1(c) (requiring Stonemar Cookeville to "discharge its duties in a good and proper manner as provided for in this Agreement, as would a prudent manager under similar circumstances). I am persuaded it is reasonably conceivable the Amended CRA attempted to diminish the Fiduciary Defendants' standard of care. Defendants appear to acknowledge as much by arguing the Amended CRA (but not analogous provisions in the CRA) bar 77 Charters' claims against Gould. *See* DOB at 46 (citing Amended CRA § 8.6.5).

[163] *See In re USACafes*, 600 A.2d at 49; *Bay Ctr.*, 2009 WL 1124451, at *10; *Feeley*, 62 A.3d at *672–73 (observing *USACafes* "has not been extended beyond duty of loyalty claims" and holding *USACafes* duties did not include the duty of care).

40

Preferred Interest to Eightfold while retaining a piece for himself.[164] In a world where 1+1 ≠ 3, the fact that Cookeville Corridor purchased the Preferred Interest from a third party (Kimco) for $1,995,283 and then, days later, sold less than the full Preferred Interest to another third party (Eightfold) for the exact same amount, is circumstantial evidence that the Amended CRA enriched the Preferred Interest to benefit Cookeville Corridor while harming 77 Charters.[165]

Defendants make two arguments in response, neither of which is persuasive. *First*, they point to Section 3.3 of the CRA, which authorizes Stonemar Cookeville and the holder of the Preferred Interest to amend the CRA and admit new members to Cookeville Retail, as a basis to argue the allegedly problematic amendments to the CRA were contractually authorized.[166] Yet it is beyond dispute that "inequitable action does not become permissible simply because it is legally possible."[167] The contractual authority to amend the CRA does not immunize the Fiduciary Defendants from a claim that they did so inequitably.

---

[164] Compl. ¶¶ 37–39, 46.

[165] Compl. ¶¶ 37–38. Defendants, of course, may well demonstrate otherwise with the benefit of discovery and a less deferential procedural posture.

[166] DOB at 32–33.

[167] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

*Second*, Defendants contend 77 Charters' 2007 investment in Jackson Plaza was so far underwater by 2018 that 77 Charters could not have been harmed by the Amended CRA because, even if the Kimco Interest Sale had never happened, 77 Charters still would have received nothing for its investment.[168]  In an effort to explain how it has been harmed, 77 Charters alleges Gould was less motivated to secure a return for Cookeville Retail's non-preferred investors (including 77 Charters) when he sold Jacksonville Plaza because he could look to his slice of the Preferred Interest to generate a return.[169]  At this juncture, I must be mindful that "allegations regarding damages can be pled generally."[170]  While it is a close call, reading the Complaint as a whole and giving 77 Charters the benefit of all reasonable inferences, I am satisfied it is reasonably conceivable the Fiduciary Defendants amended the CRA in a breach of fiduciary duty and that 77 Charters was damaged thereby.

---

[168] DOB at 34–35.  Under the waterfall, Defendants contend 77 Charters still would have been ~$2 million short of receiving any distributions had the Kimco Interest Sale never occurred.  *See id.* at 35.

[169] *See* Compl. ¶¶ 49, 60–62 ("Gould and Stonemar MM[] did not seek the best price available for the sale of Jacksonville Plaza and sought to liquidate solely for purposes of obtaining returns for themselves at the expense of the long-term investment potential" for the non-preferred investors.).

[170] *Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019) (quoting *In re Ezcorp Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016)).

For example, it is reasonably conceivable that 77 Charters could prove at trial that it was harmed when its non-preferred investment was further-subordinated to the Preferred Interest in the Amended CRA. While the parties do not meaningfully address the issue, the fact that the Amended CRA bumped up the Preferred Interest's annual returns supports an inference that 77 Charters received diminished distributions (and thereby suffered damage) in between 2013 and 2018.[171] Accordingly, the Motion must be denied to the extent it seeks dismissal of Counts I and III.

### 4. 77 Charters' Other Breach of Fiduciary Duty Theories Fail

77 Charters' excursive narrative of Wrongful Acts appears to be the foundation for other alleged fiduciary breaches.[172] To begin, 77 Charters suggests that even if the Fiduciary Defendants *did not* breach their fiduciary duties by executing the Amended CRA, they still may be found liable for their decision to sell the mall as a totally-independent breach of fiduciary duty.[173] In this regard, 77 Charters maintains that because "Defendants knew that Stonemar Cookeville would not recover any distributions and would lose substantially all of its assets from the Jackson Plaza Sale and knew that Cookeville Retail did not engage in a fair

---

[171] Compl. ¶ 49.

[172] Compl. ¶¶ 93(g), 107.

[173] Compl. ¶¶ 93(g), 107; PAB at 50–51.

43

process or obtain the best available price for the sale of Jackson Plaza, none of the Defendants reasonably believed they were acting in the best interests of the Stonemar Cookeville [sic] or its members when agreeing to sell Jackson Plaza."[174]

To be clear, 77 Charters cannot build a breach of fiduciary duty claim upon the notion that, because a fiduciary decided to liquidate an enterprise at a time when residual interest holders would receive nothing, *ipso facto* or *ipso jure*, the fiduciary breached her duties. Those who manage an enterprise do not "become guarantor[s] of success."[175] With that canon in mind, I begin the analysis, as I must, with reference to the SCA.[176] That agreement makes clear, at Section 6.1, that Stonemar MM had the *exclusive authority* to cause Stonemar Cookeville to consent to the Jackson Plaza Sale without the consent of the members.[177] Apart from this provision, the parties point to nothing in the SCA that would modify Stonemar MM's default fiduciary duties in the sale context.

---

[174] Compl. ¶ 62.

[175] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 2006 WL 4782378, at *3 (Del. Ch. Aug. 10, 2006).

[176] *Douzinas*, 888 A.2d at 1149–50.

[177] SCA § 6.1. ("The business and affairs of the Company shall be managed by and under the exclusive direction of the Managing Member and all powers of the Company may be exercised exclusively by the Managing Member."); *see also* SCA § 6.2.

Even if I were to review the decision to sell the mall to an arms-length third-party buyer with enhanced scrutiny (a proposition 77 Charters vaguely advances but I do not embrace), "[I] [would] not substitute [my] business judgment for that of [Stonemar MM], but [instead] [would] determine if [Stonemar MM's] decision was, on balance, within a range of reasonableness."[178] Assuming, *arguendo*, this is the correct standard of review, 77 Charters has not pled the factual predicates to support a breach of fiduciary duty claim when considering the Jackson Plaza Sale in isolation.[179] *First*, the Complaint feebly asserts "the documents executed for the Jackson Plaza Sale did not include a fiduciary-out or go-shop provision."[180] 77 Charters cites no cases requiring fiduciaries to take these steps as a matter of law.[181] More to the point, the Complaint lacks *any* factual allegations concerning

---

[178] *Paramount Comm. Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994); *In re Cogent, Inc. S'holders Litig.*, 7 A.3d 487, 487 (Del. Ch. 2010) (holding that when a fiduciary decides to sell a company, she incurs a duty to "pursue the best transaction reasonably available").

[179] In its Answering Brief, 77 Charters invents an allegation that the Fiduciary Defendants were motivated to sell because they wanted to avoid a "zombie company" situation where "the entity is profitable" but "growth opportunities and prospects for exit are not high enough to generate . . . return[s]." PAB at 51. The problem with this theory is that it is not pled in the Complaint. As such, I do not address it.

[180] Compl. ¶ 60.

[181] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989) ("[T]here is no single blueprint that a board must follow to fulfill its duties.").

Jackson Plaza's true value, much less allegations that a "better" process would have yielded more for the mall property.[182]

*Second*, 77 Charters argues the Jackson Plaza Sale was a self-dealing transaction for Gould since the transaction released his personal guarantee on the Loan.[183]  Yet 77 Charters has not pled Gould faced any threat of having to make good on his guarantee.[184]  To the contrary, Gould's guarantee obligations were triggered only if he committed certain bad acts such as fraud, waste or failure to pay taxes, and 77 Charters has not alleged that any of these triggers occurred.[185]  This is

---

[182] Compl. ¶¶ 63–64 (Jackson Plaza sold for $24,926,263 in September 2018.); *In re Cogent*, 7 A.3d at 497 (rejecting bald allegations that the purchase price obtained for an asset was "too low" as adequate support for a breach of fiduciary duty claim).  This is not to say 77 Charters cannot prove the mall was worth more than it sold for as a basis to support damages for its other breach claims.  The holding here is that it has not well pled a separate breach of fiduciary claim arising from the sale of the mall alone.  Stated differently, 77 Charters may be able to use evidence that Gould sold Jackson Plaza for too little to prove that it suffered damages when the CRA was amended even though it has not well pled that the Jackson Plaza Sale was an independent, substantive wrong.

[183] Compl. ¶ 65.

[184] *Cf. Revlon, Inc. v. McAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (noting directors were "aware" of "subsequent threats of suit" against them that were extinguished by a transaction into which they steered their company).

[185] Transmittal Aff. of John A. Sensing (D.I. 27) Ex. 1, ¶ 1.  *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 658–59 n.3–4 (Del. Ch. 2013) (noting the Court may consider documents incorporated by reference in the Complaint when deciding a motion to dismiss).

no surprise as the Complaint alleges Jackson Plaza sold for millions more than the outstanding principal balance on the Loan.[186]

This court has dismissed breach of fiduciary duty claims at the pleading stage where a fiduciary received a "side-deal" in a M&A transaction—not available to stockholders generally—but the fiduciary's personal benefit was a "reasonable condition[]" for the transaction.[187] Here, Gould's personal guarantees were released simply because Cookeville Retail's lenders had to be paid off when Jackson Plaza sold.[188] Under such circumstances, it is not reasonable to infer Gould "extracted" a personal benefit "at the expense" of Cookeville Retail.[189] The Jackson Plaza Sale, therefore, *cannot* form the basis for a standalone breach of fiduciary duty as the Complaint lacks the factual predicates for such a claim.

In yet another attempt to state a viable breach of fiduciary duty claim, 77 Charters makes a string of allegations that, if anything, would be breach of contract claims, not claims for breach of fiduciary duty. In this regard, 77 Charters alleges the Fiduciary Defendants caused Stonemar Cookeville to "agree to improper

---

[186] *See* Compl. ¶ 64 (alleging $4,768,045 was left over "after satisfaction" of the Loan and closing costs).

[187] *Kahn v. Stern*, 2017 WL 3701611, at *12–13 (Del. Ch. Aug. 28, 2017).

[188] Compl. ¶ 64.

[189] *Kahn*, 2017 WL 3701611, at *12.

distribution of proceeds from the sale of Jackson Plaza" and "enter into the Management and Leasing Agreements" which were not "arms' length transactions and were not entirely fair" to the company.[190]

To the extent these factual predicates support cognizable legal claims, they are breach of contract claims. "When, as the parties here did, they cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles."[191] The SCA and the CRA expressly and specifically address distributions as well as the Management Agreement.[192] If 77 Charters believes the Fiduciary Defendants were

*Remainder of Page Intentionally Left Blank*

---

[190] Compl. ¶ 93(a), (g).

[191] *Related Westpac*, 2010 WL 2929708, at *8.

[192] *See* CRA § 4.7 (incorporating the "Property Management Agreement" which entitled Stonemar Realty to "receive a monthly asset management fee equal to the difference between 4% of collected rents, less the monthly management fee."); CRA Article 8 (discussing "Distributions"); SCA Article VII (same).

paid too much under the Management Agreement or received more than their fair share of distributions, its rights and remedies are solely *contractual*.[193] Yet it has not asserted that claim, and it is too late to do so now.[194]

The remaining "Wrongful Acts" recited in the Complaint read more like a punch list of grievances than factual predicates for viable legal claims. For example, paragraph 30 insinuates Kimco's capital contributions may have been used for some purpose other than improvements to Jackson Plaza.[195] Yet 77 Charters pulls back from pleading a claim to this effect, purportedly because it is "without sufficient

---

[193] *Related Westpac LLC*, 2010 WL 2929708, at *8. 77 Charters seems to acknowledge this in the Complaint where it alleges, "[t]he payment and other terms of the Management and Leasing Agreements breach the express requirements of Sections 4.5, 4.7 and 4.9 of the [CRA]." *See* Compl. ¶ 23. Yet, mysteriously, 77 Charters omits a formal breach of contract claim for breach of these provisions in the Complaint. *See* Compl. ¶¶ 144–52 (alleging breach of contract on other grounds). In this regard, it is necessary to address the jumble that is paragraph 151 of the Complaint. Paragraph 151 comprises part of the mislabeled Count X for "Breach of Contract against Cookeville Corridor and Eightfold." Compl. ¶¶ 114, 151. Notwithstanding that 77 Charters elected not to name Stonemar MM as a defendant in this count, paragraph 151 alleges "Stonemar MM caused Stonemar Cookeville and Cookeville Retail to" breach the CRA by "agree[ing] to terms of payment" in the Management Agreement that exceeded "what was permitted in" the CRA. Compl. ¶ 151. Even if I were inclined to find that Stonemar MM was somehow on notice that Count X was pointed in its direction, Count X would fail against Stonemar MM for the same reason it fails against the other Count X Defendants. As discussed above, and in more detail below, Stonemar MM was not a party to the CRA. *See* CRA (recitals).

[194] Ct. Ch. R. 15(aaa).

[195] Compl. ¶¶ 30, 93(e), (i).

49

information to determine" whether any Defendant actually misallocated funds.[196] Similarly, 77 Charters finds it suspicious that the Loan's principal balance was not paid down after it was extended in 2007.[197] But it acknowledges that "more information is needed to determine whether Defendants engaged in any improper conduct with respect to the Jackson Plaza Loan."[198]

These portions of the Complaint fail to put Defendants "on notice of the *claim* brought against [them]."[199] Indeed, these are not claims at all; they are insinuations followed by veiled requests for information. As such, while some portions of the Complaint have stated viable claims, 77 Charters has not well pled any cause of action arising out of the Loan, the Management Agreement, capital distributions after the Jackson Plaza Sale or the use to which Gould put 77 Charters' capital contributions.

---

[196] Comp. ¶ 30; *see also* Compl. ¶ 67 ("an accounting is necessary to determine the amount of proceeds from the Jackson Plaza Sale should be made available [sic] to the general equity members of Stonemar Cookeville.").

[197] Compl. ¶¶ 72, 93(e), (i).

[198] Compl. ¶¶ 72–73.

[199] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (emphasis supplied); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 885 (Del. Ch. 2009) ("The Court is not required to accept mere conclusory allegations as true.").

*****

The determination that 77 Charters has stated a viable, albeit narrow, claim against the Fiduciary Defendants based upon the self-dealing aspects of the Amended CRA has the following implications:

- Counts IV, V and XI for aiding and abetting breach of fiduciary duty and civil conspiracy must be dismissed as to the Fiduciary Defendants.[200]

- Count VII for breach of the implied covenant of good faith and fair dealing (the "implied covenant") must be dismissed as to Stonemar MM.[201]

- Given that 77 Charters' breach of fiduciary duty claim based on the Amended CRA will proceed, the Motion must be denied to the extent

---

[200] *See* Compl. ¶¶ 110–20, 154–60; *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *22 n.123 (Del. Ch. June 23, 2015) ("Delaware law generally does not permit a claim against a fiduciary for aiding and abetting a breach of fiduciary duties, because liability in such a situation would be primary (*i.e.*, an actual breach of fiduciary duty)."); *OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015) ("In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting. It would make little sense, therefore, particularly given the vicarious liability that attaches to conspiracy, for a lower standard to apply to conspiracy than aiding and abetting. In those instances where a fiduciary takes actions that would amount to aiding and abetting by a non-fiduciary, that conduct amounts to a direct breach of fiduciary duties. Presumably, the same would be true of a conspiracy: an actor's entry into a conspiracy to facilitate another actor's breach of fiduciary duty to an entity to which the first actor owed a fiduciary would itself be a breach of the first actor's fiduciary duties.").

[201] *See Ross v. Institutional Longevity Assets LLC*, 2019 WL 960212, at *6 (Del. Ch. Feb. 26, 2019) ("To allow a fiduciary duty claim to coexist in parallel with an implied contractual claim, would undermine the primacy of contract law over fiduciary law.").

it seeks dismissal of the mislabeled Count IX—asking the Court to invalidate the Amended CRA.[202]

## B. 77 Charters Has Not Well Pled Breach of Contract or Implied Covenant Claims (Counts VII and X)

In Counts VII and X, 77 Charters brings breach of contract and implied covenant claims against Cookeville Corridor and Eightfold based on alleged breaches of the CRA and the SCA.[203] Under Delaware law, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[204]

The construction of a contract is a question of law, and Defendants have no right to dismissal under Rule 12(b)(6) unless "the interpretation of the contract on which their theory of the case rests is the only reasonable construction as a matter of law."[205] If there is more than one "reasonable construction" of contractual language,

---

[202] *See* Compl. ¶¶ 140–43. *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2018 WL 658734, at *5 (Del. Ch. Feb. 1, 2018) (stating that "a corporate action taken in violation of equitable principles is voidable") (quotation omitted).

[203] *See* Compl. ¶¶ 127–32, 153–60. As noted above, Count VII is dismissed as to Stonemar MM in light of my finding that 77 Charters has well pled a breach of fiduciary duty claim against it based on the Wrongful Acts. *See Ross*, 2019 WL 960212, at *6 (disallowing a fiduciary duty claim to proceed in parallel with an implied covenant claim based on the same wrongful acts).

[204] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[205] *CSH Theatres, LLC*, 2015 WL 1839684, at *8.

then the contract is ambiguous, and Defendants' Motion cannot be granted.[206] Of course, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[207] Instead, the court determines whether ambiguity exists by applying standard canons of contract interpretation.[208]

Before 77 Charters even gets in the starting blocks for its contract-based claims, it must contend with the fact that neither Cookeville Corridor nor Eightfold were parties to the CRA or the SCA.[209] "Delaware does not recognize breach of contract claims against non-parties to the contract."[210] The same is true for implied covenant claims.[211] 77 Charters attempts to escape this shortcoming by pleading "Cookeville Corridor and Eightfold . . . became parties to [the CRA] pursuant to section 3.2(a)(iv) upon the transfer of Kimco's interest in Cookeville Retail to Cookeville Corridor."[212]

---

[206] *Id.*, at *8.

[207] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[208] *CSH Theatres*, 2015 WL 1839684, at *8.

[209] *See* SCA (recitals); CRA (recitals).

[210] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *10 (Del. Ch. Aug. 29, 2018).

[211] *See Skye Mineral*, 2020 WL 881544, at *17.

[212] Compl. ¶ 145.

Section 3.2(a)(iv) provides, in relevant part

> A person to whom a Membership Interest is Transferred may be admitted to the Company as a member only with the consent of the other Member . . . In connection with any Transfer . . . and any admission of an assignee of a Membership Interest . . . the Member making such transfer and the assignee shall furnish the other Member with such documents regarding the Transfer *as the other Member may request* . . . including a copy of the Transfer instrument [or] a ratification or joinder by the assignee of this Agreement.[213]

Based on this language, I gather 77 Charters' theory is that Cookeville Corridor and Eightfold became members of Cookeville Retail not by virtue of their execution of the Amended CRA, but through execution of a "joinder agreement" to the CRA and then subsequent execution of the Amended CRA.[214]

For their part, Defendants point to Section 3.3 of the CRA, which allows new members to be admitted to Cookeville Retail as members and their "admission" to be "reflect[ed] . . . in an amendment to this Agreement."[215] Based on this provision, Defendants contend it is not automatic that Cookeville Corridor and Eightfold would have to join the CRA to become members of Cookeville Retail.[216]

---

[213] CRA § 3.2(a)(iv) (emphasis supplied).

[214] Compl. ¶¶ 43, 145.

[215] CRA § 3.3; DOB at 60.

[216] DOB at 60–61.

77 Charters' interpretation is not reasonably conceivable.[217] The Amended CRA, which 77 Charters incorporates into the Complaint, clearly states "[a]s of the Effective Date, each of [Eightfold] and [Cookeville Corridor] are hereby admitted as a Member" of Cookeville Retail.[218] It is not reasonable, therefore, to infer these entities were already Cookeville Retail members by virtue of a joinder agreement. As Eightfold and Cookeville Corridor were never parties to the CRA or the SCA, Counts VII and X must be dismissed as to these Defendants.

### C. 77 Charters Has Not Well Pled Unjust Enrichment (Count VI)

In Count VI, 77 Charters brings an unjust enrichment claim against Gould, Stonemar MM, Cookeville Corridor and Eightfold, alleging these Defendants were unjustly enriched by the Wrongful Acts.[219] "The elements of unjust enrichment are (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law."[220]

---

[217] *See* Compl. ¶ 49 (discussing the Amended CRA); Amended CRA § 1.2.

[218] *See* Compl. ¶ 43; Amended CRA § 1.2.

[219] Compl. ¶¶ 121–26.

[220] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).

The unjust enrichment theory was originally developed "as a theory of recovery to remedy the absence of a formal contract."[221]  Accordingly, courts have appropriately resisted attempts to bring unjust enrichment claims when, as here, "the complaint alleges an express, enforceable contract [] controls the parties' relationship . . . even when the enforceable contract gives rise to a fiduciary relationship between the parties."[222]  This is especially true in the alternative entity context where parties have agreed to an operating agreement to "govern the parties' rights."[223]

Given that 77 Charters has not alleged that the "validity" of the CRA or the SCA is "in doubt or uncertain," there is no role for an unjust enrichment claim.[224]  Here, 77 Charters has pled Stonemar MM, Stonemar Cookeville, Cookeville Retail, Cookeville Corridor and Eightfold all "had a valid contractual agreement in the form

---

[221] *Id.*

[222] *Id.*

[223] *Related Westpac*, 2010 WL 2929708, at *7.  Perhaps as an acknowledgment of this barrier to Count VI, 77 Charters purports to bring Count VI in the alternative to "fiduciary principles."  Compl. ¶ 126.

[224] *Bakerman*, 2006 WL 3927242, at *18.

of" the CRA and the SCA.[225]  77 Charters cannot "bypass" these agreements with an unjust enrichment claim.[226]  Count VI, therefore, must be dismissed.[227]

## D. 77 Charters Has Not Well Pled Aiding and Abetting or Civil Conspiracy Claims against Eightfold (Counts IV and V)

In Count IV, 77 Charters alleges aiding and abetting breach of fiduciary duty against Eightfold.[228]  To state a claim of aiding and abetting, a plaintiff must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach.[229]  I addressed the first two elements in my previous findings that the Complaint states a reasonably conceivable claim of breach of fiduciary duty against the Fiduciary Defendants.  As is often the case in aiding and abetting litigation, given the Court's finding that 77 Charters has

---

[225] Compl. ¶¶ 128–29.

[226] *Related Westpac*, 2010 WL 2929708, at *7.  Even though Gould is not a party to the SCA or CRA, this court has resisted efforts to "bypass" an operating agreement by bringing unjust enrichment claims against the owners of an entity that was a party to the relevant operating agreement.  *See id.*

[227] This conclusion applies with even greater force for Eightfold because, even though Eightfold was not a party to the CRA, for reasons noted elsewhere in this Opinion, 77 Charters has not well pled Eightfold engaged in any unjust or inequitable behavior whatsoever.  *See Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (stating a claim for unjust enrichment requires an "*unjust* retention" of a benefit) (emphasis supplied).

[228] Compl. ¶¶ 110–17.  Count IV as to Gould is addressed elsewhere in this Opinion.

[229] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

pled breach claims, the parties focus their arguments on whether 77 Charters has adequately pled "knowing participation" by the alleged aiders and abettors.[230]

An adequate pleading of "knowing participation" requires the plaintiff to well plead scienter.[231] "To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind."[232] "This Court has consistently held that 'evidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries.'"[233] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove."[234]

---

[230] *See* DOB at 48–49.

[231] *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015) (quoting *Malpiede*, 780 A.2d at 1097).

[232] *Id.* at 862 (internal quotation omitted).

[233] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *13 n.116 (Del. Ch. Sept. 30, 2009) (quoting *In re Frederick's of Hollywood, Inc. S'holders Litig.*, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998) and citing *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990)).

[234] *RBC Capital Mkts.*, 129 A.3d at 862 (citing cases).

Nothing in the Complaint suggests Eightfold was anything other than an arm's-length, third-party purchaser of the Eightfold Interest.[235] 77 Charters' conclusory assertion that Eightfold was "involved" or "aware" of the CRA or the SCA does not suggest "complicity of any kind . . . let alone 'knowing participation' by [defendant] in a breach of fiduciary duty . . . ."[236] Nothing in the Complaint supports an inference Eightfold acted to "create or exploit conflicts of interest" or "agree[]" with the Fiduciary Defendants that they would breach their fiduciary duties by executing the Amended CRA to harm 77 Charters.[237] By itself, being a counterparty to a transaction with a fiduciary does not an aiding and abetting claim make.

77 Charters attempts to salvage an inference of knowing participation by pointing to what it describes as the "suspicious … timing and terms" of the Amended CRA.[238] I struggle to follow this logic. Against the backdrop of Eightfold's

---

[235] *See* Compl. ¶ 11 (Eightfold is not affiliated with any other Defendant), ¶ 38 (Eightfold acquired the Preferred Interest from Cookeville Corridor).

[236] *In re Frederick's*, 1998 WL 398244, at *4.

[237] *Malpiede*, 780 A.2d at 1097–98.

[238] PAB at 61. 77 Charters relies on *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *14–15 (Del. Ch. Oct. 31, 2013), for the proposition that "[t]he knowledge element of an aiding and abetting or conspiracy claim can be satisfied, in certain instances, by participation in a transaction with suspicious terms and timing." PAB at 61. Whatever this generalized statement may mean, *Microsoft* is distinguishable. In that case, a fiduciary "deliberately played down" the value of intellectual property so that he could acquire it for himself and immediately sell it to a third party. The court held Microsoft had well pled an aiding and abetting claim against the third-party purchaser where it had "commenced

59

substantive right to negotiate terms that benefit itself, I see nothing in the Complaint supporting an inference Eightfold *knew* it was "advocat[ing]" for or "assist[ing]" the Fiduciary Defendants' breach of fiduciary duty.[239] I also struggle to see any cause for suspicion in the timing of the Jacksonville Plaza Sale, which occurred five years after the Kimco Interest Sale.[240] Count IV must be dismissed to the extent it is brought against Eightfold.

In similar fashion, 77 Charters brings a civil conspiracy claim against Eightfold in Count V based upon the same allegedly wrongful conduct.[241] Count V, as pled, is functionally the same as 77 Charters' aiding and abetting claim.[242] "The elements for civil conspiracy under Delaware law are: (1) a confederation or

---

patent litigation" to help the fiduciary extract the intellectual property, "conducted meaningful due diligence" into the fiduciary's acquisition of the intellectual property and "knew" the fiduciary had acquired the intellectual property for inadequate consideration. *Id.* In contrast, 77 Charters' generalized allegation that "Eightfold was involved" in the Kimco Interest Sale fails to support an inference of knowing participation. Compl. ¶ 23.

[239] *Malpiede*, 780 A.2d at 1097.

[240] *See* Compl. ¶ 31 (The Kimco Interest Sale occurred on July 1, 2013.), ¶ 57 (The Jackson Plaza Sale occurred on June 27, 2018.).

[241] *See* Compl. ¶¶ 118–20.

[242] *See Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) (recognizing the "functional identity" of the two claims).

combination of two or more person; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[243]

For the same reasons discussed above, the Complaint lacks any substantive allegation regarding Eightfold's conduct sufficient to support a reasonable inference that it formed a combination with another Defendant or committed an unlawful act in furtherance of a conspiracy. Count V must be dismissed to the extent it is brought against Eightfold.

## E. 77 Charters Has Not Well Pled Tortious Interference with Business Relation (Count VIII)

In Count VIII, 77 Charters brings a claim against Gould, Cookeville Corridor and Eightfold for tortious interference with business relationship.[244] The factual predicate for this claim is Stonemar Cookeville's alleged "reasonable business opportunity to have it or its members purchase" the Preferred Interest and its interest in "continued ownership of Jackson Plaza."[245] "To survive dismissal, a claim for tortious interference with business relations must allege: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant

---

[243] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005).

[244] Compl. ¶¶ 133–39.

[245] Compl. ¶¶ 134–36.

with that opportunity, (c) proximate causation, and (d) damages.'"[246] Such claims must be "considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[247] In other words, competition is not tortious unless it is in some way "wrongful."[248]

Here, 77 Charters has not well pled it had a reasonable probability of a business opportunity in either the Preferred Interest or perpetual ownership of Jackson Plaza.[249] As noted, both the CRA and the SCA unambiguously allow Stonemar Cookeville and Cookeville Retail's members to compete with each company's business.[250] It is, therefore, not reasonably conceivable that buying and selling the Preferred Interest, alone, was in some way wrongful. Similarly, 77 Charters has not well pled it had a reasonable expectation in "continued

---

[246] *Malpiede*, 780 A.2d at 1099 (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981), *aff'd*, 428 A.2d 1151 (Del. 1981)).

[247] *DeBonaventura*, 419 A.2d at 947; *Orthopaedic Assocs. of Southern Del., P.A. v. Pfaff*, 2018 WL 922020, at *2 (Del. Super. Ct. Feb. 9, 2018).

[248] *DeBonaventura*, 419 A.2d at 947; *Orthopaedic Assocs.*, 2018 WL 922020, at *2.

[249] Count VIII also fails to state a claim for the independent reason that 77 Charters has not well pled it was "prepared to enter into a business relationship." *See Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017).

[250] SCA § 10.4; CRA § 4.9.

ownership" of Jackson Plaza as the CRA specifically contemplated a potential sale of the mall.[251]  For these reasons, Count VIII must be dismissed.

### F. 77 Charters Has Stated a Viable Civil Conspiracy Claim Against Cookeville Corridor (Count V)

In Count V, 77 Charters asserts a civil conspiracy claim against Cookeville Corridor based on its alleged conspiracy with Gould and Stonemar MM "to commit the Wrongful Acts."[252]  Civil conspiracy is "not an independent cause of action" and, as such, the gravamen "of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which would be actionable absent the conspiracy."[253]  As noted, "[t]he elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more person; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[254]

To repeat, nothing about Cookeville Corridor's acquisition of the Preferred Interest, by itself, could constitute an independent "Wrongful Act."  On the other

---

[251] Compl. ¶ 135; CRA § 4.1(b)(1) (providing a mechanism by which Stonemar Cookeville and Kimco could approve the sale of the property); SCA § 2.3 (recognizing that the purpose of Stonemar Cookeville is to invest *and* sell property); CRA § 2.5 (same).

[252] Compl. ¶¶ 118–20.  I address Count V as to Eightfold, Stonemar MM and Gould elsewhere in this Opinion.

[253] *Kuroda*, 971 A.2d at 892; *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *3 (Del. Super. Ct. Nov. 30, 2004).

[254] *AeroGlobal*, 871 A.2d at 437 n.8; *Anderson*, 2004 WL 2827887, at *3.

hand, I have found it reasonably conceivable that Gould and Stonemar MM breached their fiduciary duties by amending the CRA in a self-dealing transaction. This independent breach of fiduciary duty could support a civil conspiracy claim.[255]

As for the first element, 77 Charters has pled Cookeville Corridor is a wholly-owned entity Gould used to amend the CRA.[256] While neither party addresses this issue in its briefs, nothing in Delaware law bars a claim that a corporate parent conspired with a wholly-owned subsidiary to commit a wrongful act.[257] Given that "the knowledge and actions of a corporation's human decision-makers and agents may be imputed to it," the Complaint supports a reasonable inference Gould and Cookeville Corridor agreed wrongfully to execute the Amended CRA.[258]

---

[255] *See OptimisCorp*, 2015 WL 5147038, at *56 ("[B]reach of fiduciary duty . . . can form the basis of a civil conspiracy.").

[256] Compl. ¶¶ 10, 43.

[257] *See Allied Capital*, 910 A.2d at 1044. In *Allied Capital*, then-Vice Chancellor Strine rejected the notion "that a parent and its subsidiary cannot conspire with one another because they don't possess two separate corporate consciousnesses (*i.e.*, that they have but one mind) and are thus incapable of agreement." *Id.* Instead, he held, "[t]he fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme. It is precisely because the corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy and aiding and abetting may have a policy purpose." *Id.*; *see also Skye Mineral*, 2020 WL 881544, at *10–11 (discussing *Allied Capital*).

[258] *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1262 (Del. Ch. 2015); *Stone & Paper Inv'rs, LLC v. Blanch*, 2019 WL 2374005, at *7 (Del. Ch. May 31, 2019) ("In the case of an entity, an individual defendant's knowledge must be attributed to the entities he controlled and used to effectuate his breaches of duty.") (internal quotation omitted).

The same result follows for the second element—an unlawful act in furtherance of the conspiracy. 77 Charters pleads Cookeville Corridor acted to amend the CRA.[259] Given that 77 Charters has well pled a breach of fiduciary duty against Gould and Stonemar MM based upon self-dealing aspects of that agreement, it is reasonably conceivable that Cookeville Corridor committed an unlawful act in furtherance of the conspiracy. Finally, I have found 77 Charters has well pled it was damaged by the Amended CRA based upon Cookeville Corridor's enhanced rights *vis-à-vis* Cookeville Retail's non-preferred investors. The Motion to Dismiss Count V, therefore, must be denied as to Cookeville Corridor.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED** in part and **DENIED** in part. Defendants' Motion to Dismiss Counts II, IV, VI–VIII and X–XI is **GRANTED**. Defendants' Motion to Dismiss Counts I, III and the mislabeled Count IX (seeking declaratory judgment) is **DENIED**. As for Count V, Defendants' Motion to Dismiss is **GRANTED** as to Eightfold, Gould and Stonemar MM but **DENIED** as to Cookeville Corridor.

**IT IS SO ORDERED.**

---

[259] Compl. ¶¶ 43–49.